**E-FILED**
Tuesday, 11 August, 2009 02:14:38 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| ANDRIA E. MOSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 08-cv-4024 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N  &  O R D E R

Before the Court are Plaintiff's Motion for Summary Judgment, filed on

November 26, 2008 (Doc. 8), and Defendant's Motion for Summary Affirmance, filed

on February 11, 2009 (Doc. 11).  For the reasons stated below, Plaintiff's Motion for

Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance

is GRANTED.

## BACKGROUND

### Procedural History

On January 19, 2005, Plaintiff Andria Moser filed for disability insurance

benefits under the Social Security Act, claiming to be under a disability since

October, 21, 2004. (R. 75-80).  Her claim was denied initially on April 18, 2005 and

again on October 7, 2005 upon reconsideration.  (R. 37-40, 43-47).  Subsequently, on

February 1, 2006, Plaintiff filed an untimely request for a hearing.  An

Administrative Law Judge (ALJ) dismissed Plaintiff's request on June 30, 2006,

finding no good cause for the late hearing request. (R. 33-36).  On August 17, 2006,

Plaintiff filed a request for review of the ALJ's dismissal. (R. 58)  The Appeals Council, on December 1, 2006, granted review and remanded the case to the ALJ for further proceedings.[1] (R.67-70).

On July 19, 2007, the ALJ held a hearing via video teleconference where the Plaintiff appeared and testified, represented by counsel Robert J. Engler.[2]  (R. 26-30, 423-446).  Also present at the hearing was Elizabeth M. Albrecht, who testified as an impartial vocational expert.  Following this hearing, Plaintiff's counsel provided the ALJ with additional employment records indicating Plaintiff did work after October 21, 2004. (R. 108-54).   As such, Plaintiff amended the onset date of disability to January 21, 2005.  (R. 108).

On December 19, 2007, the ALJ denied Plaintiff's disability claim, concluding that she was able to perform her past relevant work and was, therefore, not disabled. (R. 12-25).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council.  (R. 10-11, 420-22).  On March 11, 2008, the Appeals Council denied review of the ALJ's decision. (R. 6-9).  Accordingly, the ALJ's decision became the final decision of the Commissioner of Social Security.  See 20

---

[1] The Appeals Council found good cause for Plaintiff's late request for a hearing, as Plaintiff and her husband had been hospitalized during the relevant time period. (R. 68).

[2] The ALJ conducted the hearing from a hearing office in West Des Moines, Iowa, and Plaintiff testified via video at a designated location in Burlington, Iowa.

C.F.R. § 422.210(a).  On May 13, 2008, Plaintiff filed a complaint seeking judicial review of the ALJ's decision in federal court pursuant to 42 U.S.C. § 405(g).[3]

## Relevant Medical History

Plaintiff represents that she has been disabled since January 21, 2005. Below is a review of medical records relevant to her disability claim.

<u>Foot Pain</u>

In March 2003, Plaintiff visited a treating physician, complaining of pain in her right foot near the heel; she indicated that this pain had "been going on for quite some time." (R. 316).   The physician noted no known trauma to the foot.  (R. 316).  In November 2003, Plaintiff again complained of right foot pain, the severity of which depended upon the frequency she was on her feet.  Her physician noted plantar fasciitis of the right foot.  (R. 377).  By June 1, 2004, medical records indicate that Plaintiff's right foot pain had "definitely improved" with a 10 mg daily dosage of Bextra  (R. 373).  The next month, however, Plaintiff's right heel/foot pain apparently returned.  (R. 371).

In September 2004, Plaintiff saw podiatrist Dr. Ronald Lee, complaining of right heel pain which had been persisting for approximately one year. (R. 266).  Dr. Lee noted plantar fasciitis of Plaintiff's right foot. (R. 266).  A medical record by Dr. Lee indicates that, on September 15, 2004, Plaintiff refused a steroid injection and instead requested foot surgery.  (R. 266).  On October 21, 2004, Dr. Lee performed a successful endoscopic plantar fascial release on Plaintiff's right foot. (R. 267).  In

---

[3] At the time she filed her Complaint in federal court, Plaintiff resided in Henderson County, Illinois.  Venue is, therefore, proper under 42 U.S.C. § 405(g).

January 2005, after showing signs of improvement in the first couple months after surgery, Plaintiff began to complain of burning and shooting pain over her entire right foot.  (R. 265-66).  On January 25, 2005, Plaintiff indicated to Dr. Lee that she planned to apply for disability benefits, on the advice of her chiropractor, Dr. Jeff Pence, due to neck and lower back problems.  (R. 265).

On July 5, 2005, Dr. John Flint conducted an orthopedic exam on Plaintiff to investigate ongoing plantar fasciitis-type pain, "Morton's neuroma pain, and . . . lateral pain of her right mid foot." (R. 288).  At that visit, Plaintiff reported moderate to severe pain in her foot which limited her daily activities.  (R. 288-89).  After an examination of Plaintiff's right foot, Dr. Flint noted mild arthritis in joints of the right foot and a small spur. (R. 290-91).  However, he noted no significant ankle arthritis or subtalar arthritis.  Dr. Flint could not precisely identify the root of Plaintiff's complaint of severe and limiting right foot pain.  (R. 291).  He ordered a CT exam to further evaluate arthritis and prescribed a Plastazote shoe insert. (R. 291).

On July 26, 2005, Dr. Flint again examined Plaintiff and reviewed the results of the previously-ordered CT scan of her right foot. (R. 286).  Dr. Flint observed only minimal osteoarthritic (OA) changes in certain joints of the right foot -- no significant OA changes.  (R. 286-87).  Again, Dr. Flint could not identify the precise root of Plaintiff's complaint of severe right foot pain.  He recommended a full course of physical therapy with shoe inserts. (R. 287).  In addition, he recommended anti-inflammatory medications (as tolerated) and indicated that Plaintiff could "work as

tolerated." (R. 287). Dr. Flint advised that Plaintiff "should be the manager of her activity level and follow the dictates of her pain and the condition of the foot." (R. 287). He noted, "We emphasized that she would not do further damage by bearing weight on this foot." (R. 287).

On November 1, 2005, Dr. Naomi Laird conducted an orthopedic exam on Plaintiff, who continued her complaint of right foot pain. (R. 319-320). Dr. Laird noted that Plaintiff had not undergone physical therapy as directed but was wearing the recommended foot inserts. (R. 319). Plaintiff told Dr. Laird that the foot inserts enabled her to "tolerate being on her feet for 4 hours per day for work." (R. 319). Plaintiff reported shooting pain up her foot and heel but was not taking pain medications at that time. (R. 319). Dr. Laird noted plantar fasciitis and possible Morton's neuroma. She recommended night splinting, Achilles stretching exercises, formal physical therapy, and an adjustment to her shoe insert. (R. 319).

Asthma

Dr. James Milani treated Plaintiff for, or noted, asthma on March 28, 2003, November 6, 2003, May 3, 2004, July 29, 2004, September 29, 2004, June 16, 2005, and March 31, 2006. (R. 379, 377, 374, 372, 371, 369, 363). In November 2003, Plaintiff reported asthma flare-ups related to certain smells. (R. 377). In June 2005, Dr. Milani noted that Plaintiff's asthma was "well controlled." (R. 369). In March 2006, however, Plaintiff was admitted to the hospital because of asthma. (R. 363).

Neck/Back

Plaintiff has complained of chronic back and neck pain resulting from an auto accident in 1987 -- which caused whiplash but no fractures.  (R. 322).  In January 2004, an MRI of Plaintiff's cervical spine revealed "degenerative spurring of the cervical spine with disc degeneration and displacement." (R. 332-33).  Based on this MRI, Plaintiff's treating chiropractor, Dr. Jeff Pence, suggested limiting work duties as follows: avoid lifting, carrying, pushing, or pulling more than ten pounds; avoid repeated overhead use of arms and shoulders; and avoid prolonged or repeated stooping, bending, or twisting of the trunk or lower back.  (R. 332).

On July 20, 2005, Plaintiff visited Dr. Abernathey for a neurosurgical opinion related to her disability application (it appears she was referred to Abernathey by Dr. Pence).  (R. 282).  After reviewing an MRI of Plaintiff's cervical spine, Dr. Abernathey noted chronic spinal strain but did not recommend aggressive neurosurgical treatment "due to a paucity of clinical and radiographic findings." (R. 282).[4]

On November 30, 2005, Plaintiff was examined by Dr. Ronald Fuller at the Radiology Group Imaging Center in Davenport, Iowa. (R. 334).  Dr. Fuller performed an MRI of Plaintiff's lumbar spine, which revealed degenerative disc disease "with a small right paracentral dis[c] protrusion at L5-S1 and some neural foraminal dis[c] bulging at that same level into the right neural foramina, possibly

---

[4] Specifically, Dr. Abernathey found moderate degenerative change in Plaintiff's cervical spine at multiple levels, with mild stenosis.  However, he observed, "the neural elements are well decompressed."  (R. 282).

causing some mild right neural foraminal stenosis." (R. 334).  But he found no other significant disc bulges, disc protrusions, or central canal stenosis. (R. 334).

Fibromyalgia

On October 3, 2005, Plaintiff visited Dr. Rebecca Tuetken, a rheumatologist with the University of Iowa Hospitals and Clinics, in regard to possible fibromyalgia. (R. 322-25).  Plaintiff reported chronic pain and fatigue.  (R. 322).  A musculoskeletal exam revealed limited neck extension and flexion due to pain.  (R. 323).  Plaintiff's back showed "slight dextroscoliosis of the mid thoracolumbar spine." (R. 324).  An upper extremity exam revealed full range of motion without swelling of joints.  A lower extremity exam showed full hip, knee, ankle, and toe range of motion.  (R. 324).  Plaintiff was tender to palpation over multiple locations, especially her right foot. (R. 324).  Her stance was normal; her gait was slightly antalgic due to foot pain. (R. 324).  She had "breakaway weakness" in all four extremities, but intact sensation and reflexes within a normal range. (R. 324).  Dr. Tuetken described Plaintiff's diffuse musculoskeletal pain and tenderness over multiple points as consistent with fibromyalgia. (R. 324).  Dr. Tuetken referred Plaintiff to water therapy and to a consultation with a physiatrist at a University of Iowa-affiliated Spine Diagnostic and Treatment Center. (R. 324).[5]

---

[5] The ALJ's decision indicates that Plaintiff has experienced the following additional conditions which are not directly at issue in this action: glaucoma, high blood pressure, gastroesophageal reflux disease, headaches, adjustment disorder with depressed mood, and undifferentiated somatoform disorder.  (R. 18).

7

## Disability Evaluations

In connection with her application for disability benefits, Plaintiff underwent neurological and psychological evaluations. In addition, state agency physicians reviewed Plaintiff's medical records and determined her exertional limitations.

Neurological Evaluation

On March 4, 2005, a neurologist, Dr. Nidal Alkurdy, examined Plaintiff at the request of a state disability agency. (R. 268-270). Dr. Alkurdy reported that Plaintiff "look[ed] in good health." (R. 269). A mental status examination was normal. A cranial nerve evaluation was normal. A motor strength exam revealed "[s]ome antalgic weakness in proximal arms, right foot dorsi, and plantar flexion." (R. 269). Dr. Alkurdy noted some reflex loss in the right ankle. (R. 269). No sensory loss was noted, and Plaintiff's gait appeared normal. (R. 269). Dr. Alkurdy suspected arthritis in different joints and in Plaintiff's lumbosacral spine. (R. 270). He opined that Plaintiff "should be able to alternate sitting, standing, and moving around [in] an 8 hour shift." (R. 270). He also advised that Plaintiff should not frequently lift more than twenty-five pounds, and he noted that Plaintiff had some limitation associated with frequent squatting, climbing or crawling. (R. 270). Other than those limitations, Dr. Alkurdy reported "[n]o specific problem in handling objects in terms of seeing, speaking, and traveling" and "[n]o specific work environment hazards." (R. 270).

Agency Evaluations

On April 12, 2005, Dr. Dennis Weis, a state agency physician, reviewed Plaintiff's medical records and conducted a physical residual functional capacity assessment. (R. 273-81). In his report, Dr. Weis concluded that Plaintiff was able to do the following: lift and/or carry up to twenty pounds occasionally and up to ten pounds frequently; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of six hours in an eight-hour workday; and push and/or pull, as required, within the lift/carry limitation. (R. 274). Dr. Weis concluded that Plaintiff had no manipulative, visual, or communicative limitations. (R. 276-77). He determined that she did have postural limitations. Specifically, he noted that Plaintiff should never climb a ladder, rope, or scaffold. He further noted that Plaintiff was limited to occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (R. 275). Plaintiff had no environmental limitations with respect to extreme cold or heat, wetness, humidity, noise, and vibration. (R. 277). However, Dr. Weis advised that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, or poor ventilation. (R. 277). Dr. Weis stated that Plaintiff had "full [range of motion] of her cervical and lumbosacral spine and is fully ambulatory without assistive device." (R. 281).

On October 1, 2005, a second physician conducted a residual functional capacity assessment. (R. 293-300). In this second assessment, all of Plaintiff's functional limitations were the same as recorded in the first assessment -- except

for a few modifications in postural limitations.  The second assessment reported that Plaintiff was able to frequently climb ramps/stairs, balance, stoop, kneel, crouch, and occasionally climb ladders/ropes/scaffolds and crawl.  (R. 295).

Psychological Examination

On December 27, 2006, Plaintiff underwent a psychological examination conducted by Dr. Richard Martin.  The results were forwarded to Iowa's Disability Determination Services Bureau.  (R. 384-87).  Plaintiff denied any past mental health treatment. (R. 384).  Dr. Martin reported that Plaintiff "presented as rather dramatic regarding her pain and her allergies" and "often hit or clutched her chest in a dramatic manner."  (R. 385).  She was particularly concerned about soda smells triggering an asthma attack.  The exam indicated memory in the average range.  (R. 385).  Plaintiff exhibited a level of consciousness within normal limits. (R. 385).  She showed adequate responsiveness, average rate of mentation, and low average to average intellectual functioning. (R. 385).  Dr. Martin reported a fair attention span and an ability to maintain attention and concentration in a formal setting.  (R. 386).  Plaintiff's orientation was generally intact, as were her language abilities. (R. 386).  Dr. Martin did note that Plaintiff's motor activity was sluggish, with significant pain presentation while walking, standing, and sitting.  (R. 386).  According to Dr. Martin, Plaintiff appeared to possess the cognitive abilities required to work within a wide range of unskilled and semi-skilled vocational situations.  (R. 387).  He stated that although Plaintiff has the ability to be socially functional, she is "likely to be viewed by others as rather dramatic and self-focused."  (R. 387).  Dr. Martin

diagnosed Plaintiff with chronic adjustment disorder with depressed mood and undifferentiated somatoform disorder.  (R. 387).

### Hearing Testimony

On July 19, 2007, Plaintiff appeared with her attorney, Robert Engler, before an ALJ and presented testimony related to her disability claim.  Elizabeth Albrecht, a vocational expert, also testified at the hearing.  At the time of the hearing, Plaintiff was sixty years old.  Plaintiff indicated that she had worked full-time at a convenience store up until late 2004 or early 2005, at which time pain in her right foot became too severe for her to continue working.[6]  (R. 428-31).  According to Plaintiff, the pain in her right foot became unbearable not long after she underwent surgery on the foot in October 2004.

At the hearing, Plaintiff testified that she cannot stand for long and cannot walk much.  (R. 429).  According to Plaintiff, she has multiple herniated discs in her neck and back, osteoarthritis in her back, fibromyalgia, and problems with her hips and left knee. (R. 429).  Plaintiff testified that she has constant pain in her back and neck.  (R. 430).  She also testified to experiencing headaches regularly.  (R. 430).

Plaintiff suggested that she would be able to stand for an hour, if able to change positions.  (R. 431-32).  When standing, the pain is located in her right foot, left knee, thigh, and back.  (R. 433).  Plaintiff indicated that after an hour of standing, she would need to sit or lay down for two to four hours, depending on the situation.  (R. 432).  Plaintiff approximated that she could walk continuously for only a half block.  (R. 432). She stated that when sitting, she has pain in her hips,

---

[6] Plaintiff's earnings in 2006 are not fully explained.  (R. 428).

groin area, and back.  Depending on the chair in which she is seated, Plaintiff can sit for up to five hours if her foot is propped up.  (R. 441).  Plaintiff testified that she must use cruise control when driving because of the pain in her right foot; and she can usually only drive as far as twenty miles at a time.  (R. 433-34).  As to fibromyalgia, Plaintiff testified that she cannot function on a "bad day;" she experiences severe pain in her joints, shoulders, hips, and legs.  (R. 434-35).  Plaintiff testified that she may have "bad days" four to five times a week, if not every day of the week.  (R. 435).  On these days, Plaintiff says she must sleep all day to escape the pain.  (R. 435).  According to her testimony, pain pills either do not work or she reacts badly to them.  (R. 434).

However, Plaintiff also testified that she engages in various daily activities, including self-care, housework, feeding her dogs, and feeding hay to her horses. (R. 435-38).  In order to feed her horses, Plaintiff loads a plastic sled with twelve pounds of hay and pulls it to the horses.  (R. 436).  She does this twice a day for approximately fifteen to twenty minutes each time.  For an hour or two each day, Plaintiff performs house chores such as loading the dishwasher, sweeping, mopping, and dusting.  (R. 437-38).  Plaintiff testified that she tried physical therapy, but it did not work out because she couldn't "be out in the cold" (i.e. going out someplace and coming back home, during winter) due to her fibromyalgia.  (R. 438).  Plaintiff testified that she experiences some problems with concentrating because of her pain.  (R. 440).

At the hearing, the ALJ asked the vocational expert (VE) to consider a hypothetical person with Plaintiff's vocational characteristics and with the following functional capacity: lifting twenty pounds occasionally and ten pounds frequently; standing and sitting six hours each in an eight-hour work day; occasional stair climbing, balancing, stooping, kneeling, crawling, and crouching; occasional exposure to extremes of cold and to dust and fumes; no ladder climbing.  (R. 444). The ALJ then asked the VE what type of semi-skilled work this hypothetical person would be capable of performing.  According to the VE (who referenced the Dictionary of Occupational Titles), the hypothetical individual would be able to perform light, unskilled work as a cashier at a self-service gas station – i.e. Plaintiff's past work.  (R. 445).

The ALJ then added additional limitations to the hypothetical person's physical ability: the person's walking would be limited to one block at a time and the person's standing would be limited to one hour at a time with intermittent positional changes.  In response, the VE stated that, with the additional restrictions, the individual could still perform the job of cashier at a self-service gas station.  (R. 445).  Lastly, the VE indicated that the hypothetical person would not be able to perform the cashier job if she were unable to stand more than two hours during an eight-hour work day.  (R. 445).

### ALJ's Decision

On December 19, 2007, the ALJ issued a written decision finding Plaintiff not to be disabled under the Social Security Act.  (R. 16).  The ALJ found Plaintiff to

have the following severe impairments:  asthma, arthritis, lumbosacral pain, fibromyalgia, and right plantar fasciitis. (R. 18).  He concluded, however, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20).  In particular, the ALJ found that Plaintiff's right plantar fasciitis did not meet or equal a listed impairment because it did not render her unable to ambulate independently without a hand-held assistive device limiting the use of both arms.  (R. 21).  The ALJ found that Plaintiff's degenerative disc disease did not meet or equal a listed impairment because there was no evidence of nerve root compression, sensory/reflex loss, spinal arachnoiditis, or lumbar spinal stenosis.  (R. 21).

In determining Plaintiff's residual functional capacity (RFC), the ALJ considered Plaintiff's alleged symptoms to the extent they were consistent with or substantiated by objective evidence.  (R. 21).  After taking into account the daily activities which Plaintiff testified to performing, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her pain] . . . not entirely credible." (R. 22).  The ALJ also noted conflicts between the symptoms and limitations Plaintiff spoke about at the hearing and those she mentioned to medical providers.  (R. 23).  Specifically, the ALJ could not find corroboration in the medical records for Plaintiff's claim that she is completely non-functional four to seven days per week.  (R. 23).  Further, noting Dr. Abernathey's July 20, 2005 review of an MRI on Plaintiff's cervical spine, the ALJ determined

that Plaintiff's testimony regarding multiple herniated discs was "exaggerated and not consistent with the medical evidence." (R. 18-19).

The ALJ could not find anything in the medical records diagnosing Plaintiff with an impairment related to her purported aroma-induced asthma episodes. (R. 23). Nor could he find any medical-doctor-imposed physical limitations on Plaintiff's activities in connection with her lumbosacral spinal degenerative disc disease. (R. 24). As to Plaintiff's neck/back issues, the ALJ did not give much weight to the physical limitations advised by Plaintiff's chiropractor. (R. 23). The ALJ took note of Plaintiff's right plantar fasciitis, but he suggested that her inconsistent use (and refusal) of strong pain medication contradicted her assertions of debilitating pain associated with the condition. (R. 24). Further, he noted that Plaintiff had failed to follow through on recommended treatment of the right plantar fasciitis. (R. 24). The ALJ also took note of Plaintiff's failure to follow through on recommended treatment for fibromyalgia. (R. 23-24).

Accordingly, the ALJ determined that Plaintiff had the RFC to perform work activities, with the following limitations: lift/carry no more than twenty pounds occasionally and no more than ten pounds frequently; stand only up to one hour at a time for six hours total in an eight-hour workday, and sit only up to six hours total in an eight-hour work day. The ALJ found that Plaintiff was physically able to occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. He found that Plaintiff was not capable of climbing ladders and that she could be exposed only occasionally to cold temperature extremes, dust, and fumes. (R. 21). The ALJ

explained that restricting Plaintiff to limited light work would accommodate her lumbosacral spinal condition. He also found that the one-hour-at-a-time limit on standing would accommodate Plaintiff's right foot condition. (R. 24).

After determining Plaintiff's RFC, the ALJ concluded that Plaintiff was able to perform her past (light, unskilled) work as a self-service gasoline cashier. (R. 25). Based on testimony from the VE, the ALJ determined Plaintiff could perform the cashier job as she had actually performed it in the past and as it is generally performed in the national economy. (R. 25). Ultimately, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from the amended onset date of January 21, 2005 through the date of his written decision. (R. 25).

## DISCUSSION

### Legal Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. See McNeil v. Califano, 614 F.2d 142, 145 (7th Cir. 1980). The factual determination is made by using a five-step sequential analysis. 20 C.F.R. § 404.1520; see also Maggard v. Apfel, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to determine whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. § 404.1520(b). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(c). If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. § 404.1520(d). If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps.

At the fourth step, the claimant's Residual Functional Capacity is evaluated to determine whether the claimant can pursue her past work. 20 C.F.R. § 404.1520(e)-(f). If she cannot, then, at Step 5, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. § 404.1520(g).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g) which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Maggard, 167 F.3d at 379

(quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  The claimant has the burden to prove disability through Step 4 of the analysis, i.e. she must demonstrate an impairment that is of sufficient severity to preclude her from pursuing her past work.  <u>McNeil</u>, 614 F.2d at 145.  However, once the claimant shows an inability to perform her past work, the burden shifts to the Commissioner, at Step 5, to show the claimant is able to engage in some other type of substantial gainful employment.  <u>Id.</u>

A court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment of the evidence.  <u>See</u> <u>Pugh v. Bowen</u>, 870 F.2d 1271, 1274 (7th Cir. 1989).  A court must only determine whether the ALJ's findings were supported by substantial evidence and "may not decide the facts anew, reweigh the evidence, or substitute [its] own judgment" for that of the ALJ.  <u>See</u> <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be disturbed "so long as they find some support in the record and are not patently wrong."  <u>See</u> <u>Herron v. Shalala</u>, 19 F.3d 329, 335 (7th Cir. 1994).

However, the ALJ must articulate reasons for rejecting or accepting entire lines of evidence.  <u>Godbey v. Apfel</u>, 238 F.3d 803, 807-08 (7th Cir. 2000).  The ALJ is required to "sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence . . . and to enable us to trace the path of [his]

reasoning.' " <u>Carlson v. Shalala</u>, 999 F.2d 180, 181 (7th Cir. 1993) (quoting <u>Stephens v. Heckler</u>, 766 F.2d 284, 287 (7th Cir. 1985)).

## Analysis

Plaintiff disagrees with the ALJ's decision and makes the following arguments in opposition to it: (1) the ALJ improperly discredited Plaintiff's subjective complaints as they relate to pain; (2) the ALJ did not give adequate consideration to the opinion of Plaintiff's chiropractor in light of SSR 06-03p; and (3) Plaintiff's cervical spinal pain is a severe impairment, and the ALJ should have considered it to be a severe impairment at Step 2.  Plaintiff also argues that she should qualify for benefits if the Court finds credible her subjective complaints of pain and the RFC endorsed by her treating chiropractor.

1.  <u>ALJ's Credibility Determination Regarding Plaintiff's Complaints of Pain</u>

Plaintiff argues that the ALJ erred in discrediting her statements concerning the severity and limiting effects of her pain.  The ALJ's credibility findings will not be disturbed unless they are "patently wrong."  <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).  Here, the ALJ was not patently wrong in finding that Plaintiff's complaints of disabling pain were not entirely credible.  At the hearing, Plaintiff testified that she was completely non-functional and essentially bedridden four to seven days per week.  (R. 435).  In his decision, the ALJ pointed out that there is nothing in Plaintiff's medical records to corroborate this piece of testimony.[7]  (R. 23). It is reasonable to expect that if Plaintiff were truly confined to her bed for the

---

[7] Further, the ALJ found no medical evidence to corroborate Plaintiff's statement that she is unable to walk for more than a half block.  (R. 23).

majority of each week due to pain, this would have been reflected somewhere in the medical records.  In fact, as the ALJ noted, Plaintiff indicated to a treating rheumatologist on October 3, 2005 that she was generally capable of an above-sedentary level of activity.  (R. 24, 324).  In judging the actual severity of Plaintiff's pain, the ALJ simply gave greater weight to Plaintiff's recorded interactions with medical providers than to her testimony at the hearing; he aptly noted that her discussions with medical providers were inherently more credible because they were offered during the course of actual medical treatment.  (R. 23).

In addition, the ALJ noted Plaintiff's testimony regarding her functionality in daily activities.  (R. 435-38).  At the hearing, Plaintiff testified that she is capable of self-care and performs daily house chores such as loading the dishwasher, sweeping, mopping, and dusting.  In addition, twice daily she loads a plastic sled with twelve pounds of hay and hauls it across the road to feed her horse and pony (this takes fifteen to twenty minutes each time).  (R. 435-36).  Plaintiff's testimony regarding her daily activities is not consistent with someone who sleeps off disabling pain for days on end.

As to Plaintiff's complaints of right foot/heel pain, the ALJ took note of statements in the medical records indicating that she could not stand for longer than two hours at a time.  (R. 24, 265).  At the hearing, Plaintiff suggested that she could stand for up to an hour if she shifted positions.  Accordingly, the ALJ gave Plaintiff the benefit of the doubt by incorporating into her RFC a limitation whereby she could stand for no longer than one hour at a time.  (R. 24).  In her

hearing testimony, Plaintiff did indicate that she would have to recline and prop up her foot for two to four hours after standing for one hour.  (R. 432).  The ALJ implicitly discredited this testimony.  He pointed out that Plaintiff failed to follow through on recommended treatment for her foot condition, including physical therapy and stretching/strengthening exercises.  (R. 24, 319, 438).  He also noted that Plaintiff refused strong pain medication to control her foot pain.[8]  (R. 24, 265, 319).  Indeed, it is reasonable to expect that a near-sixty-year-old woman who requires up to four hours of reclining after one hour of standing, due to foot pain, would take a more active approach to control or mitigate the pain.[9]

In sum, the ALJ was well within his discretion in discrediting Plaintiff's statements concerning the severity and limiting effects of her pain.[10]

---

[8] Plaintiff seems to assert that strong pain pills either don't work for her or she reacts badly to them.  (R. 434; Pl. Br. at p. 19).  The argument is underdeveloped; Plaintiff has failed to more precisely substantiate it with medical evidence.

[9] In their arguments concerning Plaintiff's credibility, the parties mention Plaintiff's asthma condition.  In his decision, the ALJ noted that no physician has ever objectively confirmed any medical diagnosis in connection with Plaintiff's smell-induced asthma.  (R. 23).  The Court agrees with the ALJ that, according to medical records, Plaintiff's asthma has only intermittently presented itself in significant form.  (R. 23).  There is evidence that the asthma can be adequately controlled.  (R. 369).  Ultimately, the extent to which the asthma interferes with Plaintiff's work abilities is unclear.  Plaintiff bears the burden of this ambiguity.  See  McNeil v. Califano, 614 F.2d 142, 145 (7th Cir. 1980).

[10] In explaining his credibility determination, the ALJ did not specifically mention Dr. Martin's December 2006 psychological evaluation of Plaintiff.  In that evaluation, Dr. Martin observed Plaintiff to be "rather dramatic regarding her pain and allergies."  (R. 385).  He noted that she "often hit or clutched her chest in a dramatic manner."  (R. 385).  Dr. Martin diagnosed Plaintiff with somatoform disorder, which is a psychological disorder "marked by physical complaints for which no organic or physiological explanation is found and for which there is a strong likelihood that psychological factors are involved."  See Merriam-Webster

2.  <u>ALJ's Consideration of RFC Assessment by Plaintiff's Chiropractor</u>

Plaintiff argues that the ALJ erred in failing to properly consider the opinion of her treating chiropractor, Dr. Jeff Pence, in determining her RFC.  In a July 17, 2007 letter to Plaintiff's attorney, Dr. Pence recommended the following limitations as to Plaintiff's physical activities: lift no more than ten pounds, infrequently; avoid pushing, pulling, carrying; avoid holding the neck in the same position for extended periods of time; avoid overhead use of the arms; avoid lifting, bending, stooping, squatting, or twisting of the trunk and lower back; avoid sitting, standing, or walking for extended periods of time (an hour at a time being too long); change positions often.  (R. 419).  At the end of his letter, Dr. Pence stated, "Should you require guidelines specific to actual work capabilities[,] might I suggest that you seek the services of a functional capacity evaluator.  I would gladly assist you in this referral, if necessary."  (R. 419).

In his decision, the ALJ did not given much weight to Dr. Pence's assessment in determining Plaintiff's RFC.  Instead, as he expressly noted, the ALJ assigned greater weight to "evidence from medical doctors about [Plaintiff's] signs on examination, functional restrictions, etc."  (R. 23).  Specifically, the ALJ gave significant weight to evaluations by a neurologist (Dr. Alkurdy) and rheumatologist (Dr. Tuetken).  (R. 23-24).

Dr. Alkurdy examined Plaintiff on March 4, 2005 in connection with her disability application.  He opined that Plaintiff could alternate sitting, standing,

---

Online Dictionary, Entry for Somatoform Disorder, http://www.merriam-webster.com/medical/somatoform%20disorder.

and moving around in an eight-hour shift.  (R. 270).  He did not recommend that she frequently lift over twenty-five pounds.  Dr. Alkurdy also noted that Plaintiff may be limited in her ability to frequently squat, climb, and crawl.  (R. 270).

Rheumatologist Dr. Tuetken, on October 3, 2005, observed a full range of motion in Plaintiff's upper extremities.  A lower extremity exam revealed full hip, knee, ankle, and toe range of motion.  Plaintiff's stance was normal, and her gait was only slightly affected by foot pain.  Her sensation was intact.  (R. 324).  Plaintiff told Dr. Tuetken that, although she is "not sedentary," she would like to be more active.  (R. 324).  Dr. Tuetken diagnosed Plaintiff with fibromyalgia and noted pain associated with neck and back movement; however, Dr. Tuetken recommended only conservative treatment -- physical therapy, low dosage medication for fibromyalgia, and a referral to a physiatrist.  There is no indication that Plaintiff followed through with any of these treatment recommendations, which, as the ALJ noted, "suggests that [Plaintiff's] pain and limitations were not actually as severe enough to motivate her to try offered treatment modalities."  (R. 24).  In addition, Dr. Tuetken did not mention any physical restrictions paralleling those proffered by Plaintiff's chiropractor.

Based on his consideration of the reports of Drs. Alkurdy and Tuetken, as well as other credible medical evidence on record, the ALJ determined that Plaintiff's RFC allowed for light-work with the following restrictions: lift/carry no more than twenty pounds occasionally and no more than ten pounds frequently; stand no more than one hour at a time for six hours total in an eight-hour workday,

and sit only up to six hours total in an eight-hour work day.  The ALJ found

Plaintiff to be physically capable of occasionally climbing stairs, balancing, stooping,

kneeling, crouching, and crawling.  He determined that Plaintiff was not capable of

climbing ladders and that she could be exposed to cold temperature extremes, dust,

and fumes only occasionally.  (R. 21).

The Court finds no error in the ALJ's decision to give greater weight to the

reports of Drs. Alkurdy and Tuetken than to the assessment of Plaintiff's

chiropractor, Dr. Pence.  Generally, in the context of a disability determination, the

opinion of a physician is preferred to that of a chiropractor.  SSR 06-03p.  An ALJ

may consider a chiropractor's opinion in determining a claimant's RFC, if

appropriate under the circumstances.  SSR 06-03p.  However, a claimant's RFC is

foremost an administrative finding within the Commissioner's discretion.  20 C.F.R.

§ 404.1527.  In this case, the ALJ reasonably determined that it was not

appropriate to give evidentiary priority to Pence's July 17, 2007 letter juxtaposed to

other more probative medical evidence, i.e. the reports of licensed physicians.  The

ALJ properly executed his role as finder of fact, and it is not the Court's function to

re-weigh the evidence upon review.  See Pugh, 870 F.2d at 1274.

The Court is not persuaded by Plaintiff's suggestion that, because Dr. Pence

is Plaintiff's regular chiropractor, his assessment should be entitled to priority

consideration.[11]  In his July 17, 2007 letter, even Pence seemed to equivocate as to

the significance of his own assessment, stating, "Should you require guidelines

---

[11] Nor is the Court persuaded by Plaintiff's attempt to substantiate Dr. Pence's opinion by pointing to other physicians' impressions of Plaintiff's MRI results.  No other physician echoes the physical restrictions proffered by Pence.

specific to actual work capabilities[,] might I suggest that you seek the services of a functional capacity evaluator."  (R. 419).  Dr. Pence's equivocation tends to diminish the probative value of his assessment.  The ALJ acted reasonably in giving the chiropractor's opinion little weight.  The ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

    3.  <u>Plaintiff's Cervical Spinal Condition as a Non-Severe Impairment</u>

In the second step of the evaluation, an ALJ examines whether the claimant has a medically determinable impairment that is "severe."  20 C.F.R. § 404.1520(c).  If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step in the disability analysis.  20 C.F.R. § 404.1520(c)-(e).  In this case, the ALJ found Plaintiff to have multiple severe impairments, yet he determined that Plaintiff's cervical spinal condition was not severe.  (R. 18).

Plaintiff argues that the ALJ should have found her cervical spinal condition to be a severe impairment at Step 2.  She contends that the pain in her cervical spine limits her physical abilities "in some manner."  (Pl. Br. at p. 24).  Plaintiff's argument can be read more broadly to state that the ALJ failed to adequately consider her cervical spinal condition and its effects on her ability to work.  The Court disagrees.  The ALJ specifically referenced Dr. Abernathey's July 20, 2005 impression of an MRI exam on Plaintiff's cervical spine.  (R. 19).  In that report, Dr. Abernathey did note moderate degenerative changes in the cervical spine, with mild stenosis.  However, he recommended conservative treatment of the condition, "due

to a paucity of clinical and radiographic findings." (R. 282). Dr. Abernathey's report is substantial evidence that Plaintiff's cervical spinal condition had no more than a minimal effect on her ability to perform basic work activities. Further, the Court is not persuaded by Plaintiff's suggestion that the ALJ improperly calculated her RFC by ignoring the fact that pain in her cervical spine "limit(s) her physical abilities in some manner." [12]

4.  Ability to Return to Past Work

At Step 4 of the analysis, the ALJ found that Plaintiff was able to return to her past work as a self-service gasoline cashier. (R. 25). The ALJ made this determination based primarily on the testimony of the vocational expert (VE). At the hearing, the VE testified that someone with Plaintiff's RFC could perform the light-exertional work requirements of the unskilled cashier position. The VE testified that someone with Plaintiff's limitations could perform those work requirements as they are described in the Dictionary of Occupational Titles and as Plaintiff performed them in the past. (R. 445). Plaintiff does not directly dispute the ALJ's Step 4 finding, and the Court finds it to be supported by substantial evidence.[13]

---

[12] Plaintiff's final argument assumes the success of at least two of her first three arguments. Because Plaintiff's first three arguments have been rejected, the Court need not reach her final argument.

[13] It is worth noting that the psychological evaluation performed by Dr. Martin in December 2006 indicated that Plaintiff had the cognitive abilities necessary to function in her previous line of work. (R. 384-87).

## CONCLUSION

Substantial evidence supports the ALJ's decision that Plaintiff is not disabled under the Social Security Act.  Accordingly, Plaintiff's Motion for Summary Judgment (Doc. 8) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 11) is GRANTED.

CASE TERMINATED.

ENTERED this <u>11th</u> day of August, 2009.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States District Judge
